# EXHIBIT A

# MATHEAU J. W. STOUT, ESQ.
## ATTORNEY AT LAW

400 EAST PRATT STREET
8TH FLOOR
BALTIMORE, MARYLAND 21202

TEL (410) 429-7076
FAX (888) 907-1740
WWW.OTCLAWYERS.COM

May 2, 2018

Continental Stock Transfer & Trust Company
17 Battery Place
New York, NY 10004

Re:    CHCR- Advanzeon Solutions, Inc. f/k/a
Comprehensive Care Corp.
Shareholder: Trillium Partners, LP
Free Trading Status under Section 4(a)(1)
1,597,971 Shares

To Whom It May Concern:

I have been requested to render my opinion with respect to whether the total of One Million Five Hundred Ninety-Seven Thousand Nine Hundred Seventy-One (1,597,971) shares of Advanzeon Solutions, Inc. f/k/a Comprehensive Care Corp. ("the Company"), referenced above, in the name of Trillium Partners, LP are eligible to be issued without restricted legend and thereafter sold without registration under the Securities Act of 1933, as amended (the "Securities Act"), pursuant to an exempted transaction as authorized by Section 4(a)(1) of the Securities Act ("Section 4(a)(1)"). As discussed below, it is my legal opinion that the Shares, when issued, will be validly issued, fully paid and non-assessable, and furthermore that such Shares are free trading, and may be sold by the Shareholder pursuant to Section 4(a)(1) without restriction.

## Summary of the Shares

The Shares which are the subject of this legal opinion originate from the conversion of Promissory Note (the "Note") originally issued to Shirogane Funding, LLC (the "Original Holder") by the Company on August 14, 2015, which is greater than Two (2) Years old. The Original Holder funded the Note via check on August 26, 2015, which is the date on which the holding period began.

For purposes of this opinion, I have been furnished with and have examined originals or copies, certified or otherwise identified to my satisfaction, of all such records of the Company, agreements, and other instruments, certificates of officers and representatives of the Company, certificates of public officials and other documents as I have deemed it necessary to require as a basis for the opinion hereafter expressed.

## Facts and Assumptions

This opinion is expressed solely on the facts and assumptions set forth herein and is specifically limited to the investigation and examination stated and such other investigation as I have deemed necessary or appropriate for the purposes of rendering this opinion. After such investigation I know of no facts which lead me to conclude that any opinion set forth below is incorrect.

As to questions of fact material to such opinion, I have, where relevant facts were not independently established, relied upon certifications and/or affidavits. I have made such further legal and actual examination and investigation as I deem necessary for purposes of rendering this opinion. In my examination I have assumed the genuineness of all signatures, the legal capacity of natural persons, the correctness of facts set forth in certificates, the authenticity of all documents submitted to me as originals, the conformity to original documents of all documents submitted to me as certified or photo static copies, and the authenticity of the originals of such copies. I have also assumed that such documents have been duly authorized, properly executed, and delivered by each of the parties thereto other than the Company.

For the purposes of this opinion, I have been furnished with and have examined originals or copies, certified or otherwise identified to my satisfaction, of all such records of the Company, agreements, and other instruments, certificates of officers and representatives of the Company, certificates of public officials and other documents as I have deemed it necessary to require as a basis for the opinion hereafter expressed.

Pursuant to this engagement, I have examined the following specific documents or made the following inquiries:

1.     A copy of a Convertible Promissory Note dated August 14, 2015, under which the Company promised to pay the Original Holder the sum of One Hundred Thousand Dollars ($100,000.00); and

2.     A copy of a check from the Original Holder to the Company dated August 26, 2015 in the amount of One Hundred Thousand Dollars ($100,000.00) as consideration for the Note; and

3.     A copy of a Securities Transfer Agreement dated April 6, 2018 under which the Shareholder purchased Fifty Thousand Dollars ($50,000.00) of the Note for Fifty Thousand Dollars ($50,000.00); and

4.     A copy of the Shareholder's Signature Bank wire transfer confirmation which details the consideration paid for half of the Note (Fifty Thousand Dollars ($50,000.00)) to the Original Holder on April 6, 2018; and

5.     A copy of a Notice of Conversion dated May 1, 2018 under which the Shareholder elected to convert a total of Fifty-One Thousand Two Hundred Thirty Dollars and Ninety-Six Cents ($51,230.96) into the subject One Million Five Hundred Ninety-Seven Thousand Nine Hundred Seventy-One (1,597,971) Shares, along with a spreadsheet detailing the conversion metrics, and a Bloomberg screenshot showing the trading prices for the year prior to May 1, 2018.

The opinion set forth in this letter is subject to the following qualifications;

The opinion set forth in this letter is based solely upon my review of (i) the records of the Company including all filings, agreements or other instruments, certificates of officers and representatives of the Company or other parties and other documents as I have deemed it necessary to require as a basis for the opinion hereinafter expressed; (ii) the SEC filings and postings on OTC Markets made by the company throughout its existence (ii) such review of published sources of law and information as I have deemed necessary based solely upon my review of the above reviewed documents. As to questions of fact material to such opinion, I have, where relevant facts were not independently established, relied upon statements and information provided by other parties, where appropriate.

In addition, I have investigated such other matters and examined such other documents as I have deemed necessary in connection with the rendering of this opinion. I have assumed without any inquiry or other investigation (a) the due execution and delivery of the Reviewed Documents; (b) the accuracy, when made and on the date of this letter of each statement as to any factual matter contained in all documents; and (c) the genuineness of each signature on any of the reviewed documents, the authenticity of each of the Reviewed Documents submitted to me as an original, the conformity to the original of each of the Reviewed Documents submitted to me as a copy, the authenticity of the original of each of the Reviewed Documents submitted to me as a copy and the genuineness of all representations made by or on behalf of the Company and Shareholder. Nothing came to my attention during the course of my investigation that led me to conclude that any of such documents were not genuine or authentic or that the facts therein were not true.

## Discussion

Section 4(a)(1) of the Securities Act provides an exemption from registration for "transactions by any person other than an issuer, underwriter, or dealer." The following discussion considers the definitions of issuers, underwriters, and dealers and the nature of the Shareholder and opines on whether or not the Shareholder falls into any such categories.

## Shareholders are not the Issuer

The definition of an Issuer is set forth by the Securities Act in Section 2(4):

The term "issuer" means every person who issues or proposes to issue any security; except that with respect to certificates of deposit, voting-trust certificates, or collateral-trust certificates, or with respect to certificates of interest or shares in an unincorporated investment trust not having a board of directors (or persons performing similar functions) or of the fixed, restricted management, or unit type, the term "issuer" means the person or persons performing the acts and assuming the duties of depositor or manager pursuant to the provisions of the trust or other agreement or instrument under which such securities are issued; except that in the case of an unincorporated association which provides by its articles for limited liability of any or all of its members thereof shall not be individually liable as issuers of any security issued by the association, trust, committee, or other legal entity; except that with respect to fractional undivided interests in oil, gas, or other mineral

rights, the term "issuer" means the owner of any such right or any interest in such right (whether whole or fractional) who creates fractional interests therein for the purpose of public offering.

In the present case, Advanzeon Solutions, Inc. f/k/a Comprehensive Care Corp. is the Issuer of the Shares. The Shareholder's Non-Affiliate status is acknowledged by the Company and it has otherwise represented that Southridge is not now and within the past Ninety (90) days, was not an officer, director, or holder of 10% or more of the outstanding equity securities of the Issuer and does not, alone or together with any other person, exercise control over the Issuer.

### Shareholder Is Not a Dealer

The term "dealer" is defined by Securities Act Section 2(12):

> [A]ny person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person.

Based upon my investigation, I have determined that the Shareholder does not engage in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person. In this instance, the Debt has been held by the Shareholder since the date of funding of the Note, August 26, 2015, which is more than Two (2) Years, making the inference that the Shareholder is or was a Dealer highly unlikely.

### Shareholder is not an Underwriter

The term "underwriter" as defined by Securities Act Section 2(11) means:

> [A]ny person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission. As used in this paragraph or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

The key element in the analysis as to whether or not the Shareholder is an underwriter is whether the Debt (and thus the Shares which were converted from the Debt) were acquired with a view to participate in or engage in a "distribution" of the Issuer's securities. Distribution is not defined by the Securities Act but is essentially synonymous with "public offering." Therefore, the first prong of analysis is whether a nonpublic offering can be shown to have been made by the Issuer.

In such a case, the possibilities are diminished that the Shareholder's subsequent sale of the Shares would be considered a distribution and that the Shareholder would be deemed an underwriter, since the Shareholder held the Debt from which the Shares were converted for greater

Two (2) Years. The second prong of analysis is whether the Shareholder acquired the Shares "from [the] issuer with a view to" engage in a "distribution." In this case, the Shareholder acquired the Debt from the Company so long ago, and the Shareholder is only now converting into Shares, such that the sale now of the Shares makes the characterization of that sale a "distribution" not even remotely plausible.

### Issuer's Offering is Non-Public

Section 4(2), applicable to issuers, exempts from the registration requirements under the Securities Act, "transaction(s) by an issuer not involving a public offering." In the determination of whether or not the Original Issuance is a "public offering", I rely upon the factors set out by SEC v. Ralston Purina Co., 346 U.S. 119 (1953) and its progeny, namely, Doran v. Petroleum Management Corp., 545 F.2d 893, 900 (5th Cir. 1977) and Hill York Corp. v. American Int'l Franchises, Inc. 448 F.2d 680, 687-689 (5th Cir. 1971), and Securities Act Release No. 4552 (November 6, 1962). Those cases and releases set out relevant factors in determining whether an offering is public or private, including a) the number of offerees and their relationship to each other and to the issuer, b) the number of units offered, c) the size of the offering, and d) the manner of the offering. I also rely on the factors set out in Cook v. Avien, Inc. 573 F.2d 685, 691 (1st Cir. 1978), wherein the Court held that sales may be exempted if a private offering is made in which the purchasers 1) are limited in number, 2) are sophisticated, 3) have a relationship with the issuer enabling them to command access to information that would otherwise be contained in a registration statement.

The Company's issuance of the Note to the Original Holder, and the subsequent assignment to the Shareholder are each a single party transaction not involving any public offering and therefore exempt transactions under the Securities Act.

This conclusion is based on several factors. First, such issuance did not involve any general solicitation or advertising and included no other parties except the Company and the Shareholder. Second, the above referenced Shares can be traced directly to the Note. The Original Holder and/or the Shareholder held the Debt from which the Shares were derived for greater Two (2) Years. Third, the Shareholder was and is a sophisticated investor. Finally, the number of securities involved was and is a relatively small percentage of the total number of the Company's shares issued and outstanding at the time. These factors, in light of one another and as a whole, lead me to conclude and opine that the Original Issuance of the Shares were nonpublic transactions and did not amount to a public offering.

### Acquisition from Issuer with a View to Distribution

The second prong of analysis focuses on whether the Shareholder acquired the Shares from the issuer with a view to engage in a "distribution." A key factor used in the determination of whether or not the Shareholder acquired the Shares with a view to engage in a distribution is the determination of whether or not the Shares have "come to rest" with that Shareholder, rather than the factual determination that such Shareholder is merely a conduit through which the Issuer is making a public offering. A key factor in this determination is the timeframe in which the Shareholder has held the Debt from which the Shares were converted.

This factor and its relevancy was highlighted in <u>Ackerberg v. Johnson</u>, 892 F.2d 1328 (8th Cir. 1989) when the Court there stated:

> We begin by considering whether the securities were acquired by Johnson with a view to their distribution...While this determination would at first seem to be a fact-specific inquiry into the security holder's subjective intent at the time of acquisition, the courts have considered the more objective criterion of whether the securities have come to rest. That is, the courts look to whether the security holder has held the securities long enough to negate any inference that his intention at the time of acquisition was to distribute them to the public.

The Court then went on to define when the securities had been held long enough to negate the inference of a distribution by citing <u>United States v. Sherwood</u>, 175 F.Supp. 480, 483 (S.D.N.Y 1959): "The passage of two years before the commencement of distribution of any of these shares with a view to distribution thereof." The Ackerberg court also highlighted the two year holding period under the then Rule 144 promulgated under the Securities Act of 1933, as amended ("Rule 144") and stated "Many courts have accepted a two-year rule of thumb to determine whether the securities have come to rest...This two-year rule has been incorporated by the SEC into Rule 144, which provides a safe harbor for persons selling restricted securities acquired in a private placement."

As to the second prong of analysis, the Debt came to rest for more Two (2) Years. As reasoned by the Ackerman court, the time element in Rule 144 safe harbor provides some guidance into the determination of whether or not the Shares have "come to rest." Rule 144, as amended on February 15, 2008, allows a safe harbor from Section 4(a)(1) in situations where a shareholder has held Debt from which Shares are converted: (i) for a period exceeding six (6) months where the Issuer is subject to and current in its reporting requirements of Section 13 or 15(d); or (ii) for a period exceeding twelve (12) months where the Issuer is not subject to and/or not current in its reporting requirements of Section 13 or 15(d).

The fact that the Original Holder and/or the Shareholder has held the Debt, and thus is considered to have held the Shares derived from that Debt for a period of more than Two (2) Years and the fact that the Debt had accordingly come to rest in the control of the Shareholder provides ample evidence that the Shares were held for the Shareholder's own account and that the Debt/Shares were not acquired from the Issuer "with a view to" engage in a "distribution." Therefore, 1) where the Issuer's offering of securities was a nonpublic transaction, and 2) where the issuance to the Shareholder was a separate, and nonpublic transaction and 3) where the Shareholder has been holding the Debt/Shares for its own account, and has held those Shares for more Two (2) Years, the Shareholder should not be deemed an underwriter under the Securities Act.

## Conclusion

Based on my examination of the above described documents and relevant law and subject to the limitations expressed herein, I am of the opinion that the Shareholder is not an issuer, underwriter, or dealer and, therefore, the sale of the Shares is exempt under Securities Act Section

4(a)(1). Based upon the foregoing, the Shares are free trading, and may be sold by the Shareholder pursuant to Section 4(a)(1) without restriction.

This opinion is given without regard to any change after the date of this letter with respect to any factual or legal matter, and I disclaim and obligation to notify you concerning any such change.

This opinion may be relied upon by the Shareholder, the Transfer Agent for the issuer and the Shares covered hereby for the sole and express purpose of registering transfer of the Shares on behalf of the Shareholders in accordance Section 4(a)(1), legal counsel for the Issuer, legal counsel for the Transfer Agent, a broker dealer who accepts this resulting Securities for deposit, legal counsel for such broker dealer, and any clearing agent that is holding the Securities for the Shareholders. This opinion may not be relied upon by any other party for any other purpose and may not be reproduced or distributed (except to governmental or regulatory agencies as required by regulation or law) without the prior written permission of named counsel.

In the event the United States Securities and Exchange Commission subsequently advises the parties hereto that it believes the Shares covered by this opinion may not be sold pursuant to Section 4(a)(1) as described herein, then this opinion letter shall be void as it relates to any sale of such Shares that are made after the date of receipt of such notice. I am admitted to practice law in the State and Federal Courts of Maryland. The opinion expressed above are limited to the Federal Laws of the United States of America and no opinion is provided regarding any federal or state law not specifically referenced herein.

The opinion set forth herein is expressed as of the date hereof and remain valid so long as the documents, instruments, records and certificates I have examined and relied upon as noted above are unchanged and the assumptions I have made, as noted above, are valid. If any facts or documents are determined to be incorrect, misstated, or misrepresented, then the opinion expressed herein may not continue to be valid. This opinion is based expressly on the facts stated herein, and may not be relied upon in the event that other facts, not presently known to me, come to light. Opinion letters of counsel are not binding upon the Securities and Exchange Commission ("SEC") or the Courts, and to the extent that persons relying upon this letter may have knowledge of facts and circumstances that are contrary to those upon which this opinion is based, this opinion would not be applicable. Furthermore, the opinion herein is rendered as of the date hereof, and I disclaim any undertaking to advise you hereafter of developments hereafter occurring or coming to my attention, whether or not the same would (if now existing and known to this office) cause any change or modification herein.

If you have any questions, please contact me directly at (410) 429-7076. Thank you.

Sincerely,

Matheau J. W. Stout

## PHARMACY VALUE MANAGEMENT SOLUTIONS, INC

### CONVERTIBLE PROMISSORY NOTE

Principal Amount: **U.S. $100,000**                                          **August 14, 2015**

This Pharmacy Value Management Solutions, Inc. Convertible Promissory Note (this "Note") is made as of **August 14, 2015** (the "Effective Date") by Pharmacy Value Management Solutions, Inc., a Nevada corporation (the "Company"), in favor of **Shirogane Funding, LLC** (the "Holder"), pursuant to that that certain Pharmacy Value Management Solutions, Inc. Convertible Promissory Note and Warrant Purchase Agreement of even date herewith, by and between the Company and the Holder (the "Purchase Agreement"). For value received, the Company promises to pay the Holder, the principal sum of U.S. **One Hundred Thousand Dollars (U.S. $100,000)**, plus accrued interest. Interest shall accrue from the date of this Note on the unpaid principal amount at a rate equal to **Twelve Percent (12%)** per annum, and be due and payable at the Maturity Date (as defined below). This Note shall be subject to the following terms and conditions.

1.     Maturity. The principal amount and any accrued but unpaid interest under this Note shall be due and payable on the earliest to occur of the following (the "Maturity Date"): (i) the date which is **Twelve (12) Months** after the Effective Date; and (ii) receipt by Advanzeon Solutions, Inc. (the "Parent") of payment on its account receivable owed to it by Universal Health Care, Inc. and Universal Health Care Insurance Company, Inc., collectively, Universal (the "Account Receivable"), which Account Receivable is currently being processed in the matter of THE RECEIVERSHIP of Universal Health Care, Inc., a Florida corporation and THE RECEIVERSHIP of Universal Health Care Insurance Company, Inc., a Florida corporation, under Case Numbers 2013-CA 00375 and 2013-CA 00358, respectively.

2.     Voluntary Conversion. The Holder shall have the right to convert all or a portion of the Note, along with accrued and unpaid interest, into shares of the common stock of the Parent at a per share price equal to the lesser of (i) 15% below the average daily closing bid price of the Parent's common stock for the immediate preceding twenty (20) business days; or (ii) $0.11. The Holder shall submit a Conversion Notice indicating his/her election to convert and the amount being converted.

(a)     Mechanics and Effect of Conversion. No fractional shares will be issued upon conversion of this Note. In lieu of any fractional share to which the Holder would otherwise be entitled, the Parent will round down to the nearest whole share. Upon conversion of this Note pursuant to this Section 2, the Holder shall surrender this Note, duly endorsed, at the principal offices of the Company or any transfer agent of the Company. At its expense, the Company will, as soon as practicable thereafter, deliver to such Holder, at such principal office, the certificate or certificates for the number of Common Shares to which such Holder is entitled upon such conversion. Upon conversion of this Note, the Company will be forever released from all of its obligations and liabilities under this Note with regard to that portion of the principal amount and accrued interest being converted including without limitation the obligation to pay such portion of the principal amount and accrued interest.

3.     Payment; Prepayment. All payments shall be made in lawful money of the United States of America at such place as the Holder hereof may from time to time designate in writing to the Company. Payment shall be credited first to the reimbursement of expenses due hereunder, then to the accrued interest then due and payable and the remainder applied to principal. Prepayment of this Note may be made at any time without penalty.

4.     Optional Extension.  The Maturity Date of this Note may not be extended beyond the Maturity Date without the mutual agreement of the Company and Holder.

5.     Default.  In the case of an Event of Default (as defined below), the Holder shall have all rights available to it at law or in equity, including all rights available under the Delaware Uniform Commercial Code.  As used herein, an "Event of Default" means: (i) the Company failing to make payment under this Note within ten (10) days of the Maturity Date; (ii) the commission of any act of bankruptcy by the Company, the execution by the Company of a general assignment for the benefit of creditors, the filing by the Company of a petition in bankruptcy or any petition for relief under the federal bankruptcy act or the continuation of such petition without dismissal or bonding for a period of ninety (90) days or more, or the appointment of a receiver or trustee to take possession of the property or assets of the Company; and (iii) the Company's material breach of this Note or the Purchase Agreement, and such breach remains unremedied for thirty (30) days after the date the Company's management receives written notice of such breach. Upon an Event of Default, the Holder may declare all amounts of principal and interest owed hereunder immediately due and payable.  Any outstanding interest shall be increased and shall continue to accrue from the Effective Date on the amount in default at a rate of **Twenty Percent (20%)** per annum, not to exceed the highest lawful rate. The Company shall reimburse the Holder for any reasonable costs and attorneys' fees incurred by the Holder in connection with the enforcement or preservation of any rights or remedies under this Note and any other documents executed in connection with this Note, and in connection with any amendment, waiver, "workout" or restructuring of this Note. In the event of a lawsuit or arbitration proceeding, the prevailing party is entitled to recover costs and reasonable attorneys' fees incurred in connection with the lawsuit or arbitration proceeding, as determined by the court or arbitrator.  In the event that any case is commenced by or against the Company under the Bankruptcy Code (Title 11, United States Code) or any similar or successor statute, the Holder is entitled to recover costs and reasonable attorneys' fees incurred by the Holder related to the preservation, protection, or enforcement of any rights of the Holder in such a case.  As used herein, "attorneys' fees" includes the allocated costs of the Holder's in-house counsel.

6.     Grant of Lien and Security Interest.   To secure payment and performance of all obligations under this Note, the Company hereby grants, pledges and assigns to the Holder a continuing security interest in, a lien upon, and a right of set off against all personal and real property and fixtures, and interests in property and fixtures, of the Company, whether now owned or hereafter acquired or existing, and wherever located (the "Collateral").   The Company shall take all action that may be necessary or desirable, or that Holder may reasonably request, so as at all times to maintain the validity, perfection, enforceability and priority of Holder's security interest in and lien on the Collateral or to enable Holder to protect, exercise or enforce its rights hereunder and in the Collateral. The Company hereby authorizes Holder to file against the Company, one or more financing continuation or amendment statements pursuant to the applicable Uniform Commercial Code in form and substance satisfactory to the Holder.

7.     Transfer; Successors and Assigns.  The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of Company and the Holder. Notwithstanding the foregoing, neither the Company nor the Holder may assign, pledge, or otherwise transfer this Note without the prior written consent of the other, except for transfers to affiliates. Subject to the preceding sentence, this Note may be transferred only upon surrender of the originally-signed Note for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, a new note for the then-current principal amount will be issued to, and registered in the name of, the transferee. Payment is payable only to the registered holder of this Note.

8.     Governing Law.  This Note and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed, and interpreted in accordance with the laws of the State of Nevada, without giving effect to principles of conflicts of law.

9.     Notices.  Any notice required or permitted by this Note shall be in writing and shall be deemed sufficient upon delivery, when delivered personally or by electronic mail or by a nationally-recognized delivery service (such as Federal Express or UPS), or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, addressed to the party to be notified at such party's address as set forth below or as subsequently modified by written notice.

10.     Amendments and Waivers.  Any term of this Note may be amended only in a writing signed by the Company and holders of a majority in interest of the principal amount of all notes issued pursuant to the Purchase Agreement (collectively, the "Notes"). Any amendment or waiver affected in accordance with this Section 10 shall be binding upon the Company, all Holders, and each transferee of the Note; *provided, however,* that any amendments which affect one or more Holders differently than all other Holders ("Minority Holders") shall only become effective once consented to in writing by such affected Minority Holders.

11.     Entire Agreement; Severability.  This Note, the Purchase Agreement and the form of Warrant constitute the entire agreement and understanding of the Company and the Holder relating to the subject matter set forth in this Note and supersede any and all previous (oral or written) agreements or understandings between the Company and the Holder relating thereto. If a court of competent jurisdiction finds any provision of this Note to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; *provided, however,* if the offending provision cannot be so modified, it shall be stricken and all other provisions of the Note in all other respects shall remain valid and enforceable.

12.     Statutory Notice.     ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF DEBT ARE NOT ENFORCEABLE UNDER NEVADA LAW.

**THE COMPANY AND THE HOLDER EACH SUBMIT TO THE EXCLUSIVE JURISDICITON AND VENUE OF THE FEDERAL AND STATE COURTS OF THE STATE OF NEVADA LOCATED IN CLARK COUNTY AND HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH THE COMPANY AND THE HOLDER MAY BE PARTIES, ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY PERTAINING TO, THIS NOTE. THIS WAIVER IS KNOWINGLY, WILLINGLY, AND VOLUNTARILY MADE BY THE COMPANY AND THE HOLDER, AND THE COMPANY AND THE HOLDER HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. THE COMPANY AND THE HOLDER EACH FURTHER REPRESENTS AND WARRANTS THAT EACH OF THEM HAS BEEN REPRESENTED IN THE SIGNING OF THIS NOTE AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL SELECTED OF THEIR OWN FREE WILL, AND THAT EACH OF THEM HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.**

[Signature Page Follows]

**AGREED AS TO HOLDER'S
CONVERSION RIGHTS BY
ADVANZEON SOLUTIONS, INC.**
(a Delaware Corporation)

**COMPANY: PHARMACY VALUE MANAGEMENT
SOLUTIONS, INC.**
(a Nevada Corporation)

_____
Clark Marcus, Chief Executive Officer

_____
Clark Marcus, Chief Executive Officer
Address:         2901 W. Busch Blvd, Suite 701
                 Tampa, FL 33618

Signature Page to Pharmacy Value Management Solutions, Inc. Convertible Promissory Note

| | | | | |
|---|---|---|---|---|
| **Amount:** | $100,000.00 | **TransCode:** | 187 |
| **Account:** | 7404270956 | **Routing:** | 21912915 |
| **CheckNum:** | 147 | **PostDate:** | 08/28/2015 |
| **DIN:** | 704940661 | **Debit_Credit:** | D |
| **Tran_ID:** | 704940636 | **Dep_Acct:** | 61000146 |
| **Orig_DIN:** | 704940661 | **CycleDate:** | 08/28/2015 |
| **Disposition:** | | **Dep_Bank:** | 91017 |
| **Batch_ID:** | 910 | | |

**SHIROGANE FUNDING LLC**
ATTN YENWEN TOCHIMOTO
1016 GULL AVE.
FOSTER CITY, CA 94404

147

DATE 8/26/15

PAY TO THE ORDER OF  Pharmacy Value Management Solutions Inc.   $100,000.00

One Hundred Thousand only   DOLLARS

**Ameritrade**

MEMO _____

⑈021912915⑈ 7404270956⑈ 0147

Cadence Bank 455553336
For Deposit Only
Advanzeon Solution Inc
Account: 7000456072
Pharmacy Value Mgmt

SECURITIES TRANSFER AGREEMENT

**SECURITIES TRANSFER AGREEMENT** (the "Agreement"), dated as of March 20, 2018, by and between Shirogane Funding LLC ("Seller"), and Trillium Partners LP ("Purchaser").

The Seller is the holder of certain convertible note obligation, originally dated August 14, 2015 issued by Pharmacy Value Management Solutions, Inc. (the "Company"), a wholly owned subsidiary of Advanzeon Solutions, Inc. (f.k.a. "Comprehensive Care Corporation") (the "Parent") for money lent, in the principal amount of $100,00 (the "Original Note"). The Original Note is convertible into shares of common stock of the Parent.

Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller $50,000.00 in principal of the Original Note (the "Purchased Note"); such purchase and sale shall be made upon the terms and conditions set forth in this Agreement.

Purchaser and Seller are executing and delivering this Agreement in reliance upon an exemption from securities registration afforded by the Securities Act of 1933, as amended (the "1933 Act");

**NOW THEREFORE**, in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **PURCHASE AND SALE OF SELLER'S PURCHASED NOTE.**

a. Purchase of the Purchased Note.

(i) On the Transfer Closing Date (as defined below), Seller agrees to sell and deliver to Purchaser, and Purchaser agrees to purchase from Seller, the Purchased Note, for cash consideration equal to $50,000.00.

(ii) Purchaser understands and acknowledges that the rights and privileges relating to the Purchased Note are set forth in the Original Note and Purchaser represents that Purchaser has reviewed the terms and provisions contained therein.

b. Transfer Closing Date. Subject to the satisfaction (or waiver) of the conditions thereto set forth in Section 4 and Section 5 below, the date and time of the sale of the Purchased Note by Seller to Purchaser pursuant to this Agreement ("Transfer Closing Date") shall be no later than March 31, 2018. The closing of the transactions contemplated by this Agreement (the "Closing") shall occur at such other location as may be agreed to by the parties.

c.    Form of Payment. On the Transfer Closing Date, (i) Purchaser shall deliver to the Seller $50,000.00 in immediately available funds by wire transfer, and (ii) Seller shall deliver to Purchaser the Purchased Note, duly endorsed to Purchaser.

d.    Consent and Acknowledgments of the Company and the Parent.

(i)    Each of the Company and the Parent, as evidenced by its signature at the foot of this Agreement, hereby represents and warrants that upon Purchaser's delivery to the Company and Parent of the Purchased Note (together with endorsement by the Seller) the Company and Parent shall promptly cause to be issued to and in the name of Seller (i) issue one or more promissory notes representing the Purchased Note in the name of such Purchaser on or promptly after a Transfer Closing Date. Such replacement note issued to the Purchaser ("Replacement Note") shall have the same terms as the Purchased Note except the Replacement Note (i) shall indicate that it was originally issued to the Seller on August 14, 2015 (the "Issue Date"), (ii) notwithstanding the convertibility of the Original Note, the Replacement Note shall be convertible into the Parent's common stock, at any time at the option of the Purchaser, at an initial conversion price per share equal to fifty percent (50% (0.50)) (the "Multiplier") of the lowest closing bid price for the Parent's common stock during the twenty (20) trading days immediately preceding a conversion date, as reported by Bloomberg (the "Closing Bid Price") ("Initial Conversion Price"); provided that if the closing bid price for the common stock on the Clearing Date (defined below) is lower than the Closing Bid Price, then the Purchase Price shall be adjusted such that the Multiplier shall be multiplied by the closing bid price on the Clearing Date, and the Company shall issue additional shares to Purchaser to reflect such adjusted conversion price, and (iii) the Replacement Note shall have a limitation on conversion equal to 9.99% of the Parent's outstanding common stock. For purposes of this Agreement, the Clearing Date shall be on the date in which the conversion shares are deposited into the Purchaser's brokerage account and Purchaser's broker has confirmed with Purchaser the Purchaser may execute trades of the conversion shares. The Company and Parent shall bear any and all miscellaneous expenses that may arise as a result of conversion and delivery of shares of common stock in respect of the Replacement Note, including but are not limited to the cost of the issuance of a Rule 144 legal opinion, transfer agent fees, equity issuance and deposit fees, etc. At Purchaser's option, any accrued costs paid by Purchaser may be added to the dollar amount of any conversion of the Replacement Note.

(ii)    The signature by the Company and Parent also represents their agreement to (x) pay to Purchaser and (y) treat Purchaser as a party to, and having all the rights of, and obligations of, in the place and stead of Seller with respect to the Purchased Note.

(iii)    Each of the Company and Parent represents that by a date no later than the Issue Date, (w) the Company had accrued payment obligation to Seller equal to the principal amount of the Original Note, and (x) the Original Note had been issued to the Seller. Each of the Parent and the Company has no information that the Seller did not

2

have continuous and uninterrupted beneficial ownership of the Original Note since the Issue Date through and including the date hereof.

(iv)    Each of the Company and Parent acknowledges that it will take all reasonable steps necessary or appropriate, including providing an opinion of counsel confirming the rights of Purchaser to sell shares of Common Stock issued to Purchaser on conversion of the Replacement Note pursuant to Rule 144 as promulgated by the SEC ("Rule 144"), as such Rule may be in effect from time to time. If the Parent does not promptly provide an opinion from Parent counsel, and so long as the requested sale may be made pursuant to Rule 144, Parent agrees to accept an opinion of counsel to the Purchaser which opinion will be issued at the Parent's expense.

(v)    The Parent confirms that it has instructed its transfer agent to reserve at least 5,000,000 shares of its Common Stock for issuance to Purchaser on conversion of the Replacement Note.

(vi)    Each of the Company and the Parent confirms that, upon consummation of the transactions contemplated hereby, Purchaser will be entitled to all of the rights held by Seller with respect to the Purchased Note as if Purchaser had been a holder of that portion of the Original Note, all of which, to the best knowledge of the Company and Parent, remain in full force and effect as of the date hereof. To the best knowledge of the Company and Parent, no payments have been made to Seller on account of any such rights and Seller has not, directly or indirectly, waived or relinquished any of such rights. In furtherance of the foregoing and not in limitation thereof, the Company acknowledges that no liquidated damages have accrued with respect to the Original Note, and (y) all other provisions of the Original Note remain in full force and effect.

(vii)    Each of the Company and the Parent covenants to provide all available Current Public Information as defined in Rule 144 (c) and timely (or as soon as possible) file with the SEC all reports required to be filed under the Securities Exchange Act of 1934 (the "SEC Reports") until such time as the Purchase Note has been paid in full, or converted in full into shares of the Parent's common stock.

(viii)    Except as specifically disclosed to Purchaser, or otherwise contained in its SEC Reports, (i) there has been no event, occurrence or development that, individually or in the aggregate, has had or that could reasonably be expected to result in a Material Adverse Effect, (ii) neither the Parent nor any of its Subsidiaries has incurred any material liabilities other than (A) trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice and (B) liabilities not required to be reflected in the Parent's financial statements pursuant to GAAP or required to be disclosed in filings made with the SEC, (iii) the Parent has not altered its method of accounting or the identity of its auditors, (iv) the Parent has not declared or made any dividend or distribution of cash or other property to its stockholders, in their capacities as such, or purchased, redeemed or made any agreements to purchase or redeem any shares of its capital stock (except for repurchases by the Parent of shares of capital stock held by employees, officers, directors, or consultants pursuant to an option of the Parent to repurchase such shares upon the

termination of employment or services), and (v) neither the Parent nor any of its Subsidiaries has issued any equity securities to any officer, director or Affiliate, except pursuant to existing Parent stock-based plans. No representation or warranty or other statement made by the Parent or any Subsidiary in this Agreement or in its SEC Reports, contains any untrue statement or omits to state a material fact necessary to make any such statement, in light of the circumstances in which it was made, not misleading.

(ix) Each of the Company and the Parent acknowledges that Purchaser is expressly relying on the provisions of this Section 1(d) in entering into this Agreement and consummating the transactions contemplated hereby. Any change of circumstance which would prevent the Parent from delivering shares of common stock to Purchaser based upon conversion of the Replacement Note, or prevent the Purchaser from selling such conversion shares pursuant to Rule 144 will be deemed a default of this Agreement.

## 2. PURCHASER'S REPRESENTATIONS AND WARRANTIES. Purchaser represents and warrants to Seller and to the Company that:

a.      Accredited Purchaser; Investment Purpose. Purchaser represents that it is an "Accredited Investor" as defined in Regulation D under the Securities Act of 1933. Purchaser is purchasing the Purchased Note for its own account for investment purposes only and not with a view towards, or for resale in connection with, the public sale or distribution thereof, nor with any present intention of distributing or selling the same, and it has no present or contemplated agreement, undertaking, arrangement, obligation, indebtedness or commitment providing for the disposition thereof; provided, however, that by making the representations herein, Purchaser does not agree to hold the Replacement Note or any Common Stock issued upon conversion of or in payment of interest on the Replacement Note for any minimum or other specific term and reserves the right to dispose of the Replacement Note or any of such Common Stock at any time in accordance with or pursuant to a registration statement or an exemption under the 1933 Act and applicable state securities laws.

b.      Reliance on Exemptions. Purchaser understands that the Purchased Note is being offered and sold to it in reliance upon specific exemptions from the registration requirements of United States federal and state securities laws and that Seller and the Company are relying upon the truth and accuracy of, and Purchaser's compliance with, the representations, warranties, agreements, acknowledgments and understandings of Purchaser set forth herein in order to determine the availability of such exemptions and the eligibility of the Purchaser to acquire the Purchased Note.

c.      Non-affiliate Status. Purchaser is not, and has not for in excess of ninety (90) days been, and subsequent to the Transfer Closing Date will not be, an "Affiliate" of the Parent, as that term is defined by Rule 144 under the 1933 Act. Purchaser is not acting in concert with any other person in a manner that would require their sales of securities to be aggregated for purposes of Rule 144 or would cause Purchaser to be considered an "Underwriter" as that term is defined by Section 2 of the 1933 Act.

4

d.      Company Information. Purchaser and its advisors, if any, have been furnished with all materials relating to the business, finances and operations of the Parent and Company, including copies of the Company most recent publicly available financial statements as available on the SEC's EDGAR system. Purchaser and its advisors have been afforded the opportunity to ask questions of Seller. Neither such inquiries nor any other due diligence investigation conducted by Purchaser or any of its advisors or representatives shall modify, amend or affect Purchaser's right to rely on Seller's representations and warranties contained in Section 3 below. Purchaser understands that its investment in Purchased Note (and/or in the Common Stock issuable thereunder), involves a significant degree of risk.

e.      Governmental Review. Purchaser understands that no United States federal or state agency or any other government or governmental agency has passed upon or made any recommendation or endorsement of the Purchased Note or of the Common Stock issuable thereunder.

f.      Transfer or Resale. Purchaser understands that (i) the sale or resale of the Replacement Note and the Common Stock issuable thereunder has not been registered under the 1933 Act or any applicable state securities laws, and the Replacement Note and the Common Stock issuable thereunder may not be transferred unless (a) such security is sold pursuant to an effective registration statement under the 1933 Act, (b) the security is sold or transferred pursuant to an exemption from such registration, (c) the security is sold or transferred to an "affiliate" (as defined in Rule 144 promulgated under the 1933 Act or a successor rule; "Rule 144") of Purchaser who agrees to sell or otherwise transfer the security only in accordance with this Section 2(f) and who is an Accredited Investor, or (d) (i) the Common Stock is sold pursuant to Rule 144, if such Rule is available; (ii) any sale of such Common Stock made in reliance on Rule 144 may be made only in accordance with the terms of said Rule and further, if said Rule is not applicable, any resale of such Common Stock under circumstances in which the seller (or the person through whom the sale is made) may be deemed to be an underwriter (as that term is defined in the 1933 Act) and may require compliance with some other exemption under the 1933 Act or the rules and regulations of the SEC thereunder.

g.      Authorization; Enforcement. This Agreement has been duly and validly authorized by Purchaser. This Agreement has been duly executed and delivered on behalf of Purchaser, and this Agreement constitutes a valid and binding agreement of Purchaser enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of creditors' rights and remedies or by other equitable principles of general application.

h.      No Brokers. Purchaser has taken no action which would give rise to any claim by any person for brokerage commissions, finder's fees or similar payments relating to this Agreement or the transactions contemplated hereby.

3.    **REPRESENTATIONS AND WARRANTIES OF SELLER**. Seller represents and warrants to Purchaser that:

a.    Authorization; Enforcement. (i) Seller has all requisite power and authority to enter into and perform this Agreement and to consummate the transactions contemplated hereby and to sell the Purchased Note in accordance with the terms hereof, (ii) the execution and delivery of this Agreement by Seller and the consummation by it of the transactions contemplated hereby have been duly authorized by Seller and no further consent or authorization of Seller or its members is required, (iii) this Agreement has been duly executed and delivered by Seller, and (iv) this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of creditors' rights and remedies or by other equitable principles of general application.

b.    Title. Seller has good and marketable title to the Original Note, free and clear of all liens, pledges and encumbrances of any kind.

c.    No Conflicts. The execution, delivery and performance of this Agreement by Seller and the consummation by Seller of the transactions contemplated hereby will not (i) violate or conflict with, or result in a breach of any provision of, or constitute a default (or an event which with notice or lapse of time or both could become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, note, bond, indenture or other instrument to which Seller is a party, or (ii) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws and regulations and regulations of any self-regulatory organizations to which Seller is subject) applicable to Seller or by which any property of the Seller are bound or affected. Except as specifically contemplated by this Agreement and as required under the 1933 Act and any applicable federal and state securities laws, neither Seller nor the Company is required to obtain any consent, authorization or order of, or make any filing or registration with, any court, governmental agency, regulatory agency, self regulatory organization or stock market or any third party in order for it to execute, deliver or perform any of its obligations under this Agreement in accordance with the terms hereof. Except for filings that may be required under applicable federal and state securities laws in connection with the issuance and sale of the Original Note, all consents, authorizations, orders, filings and registrations which Seller is required to obtain pursuant to the preceding sentence have been obtained or effected on or prior to the date hereof.

d.    No Brokers. Seller has taken no action which would give rise to any claim by any person for brokerage commissions, finder's fees or similar payments relating to this Agreement or the transactions contemplated hereby.

e.    Rule 144 Matters. Seller, as assignee, has owned the Original Note since the Issue Date. Seller is not, and for a period of at least ninety (90) days prior to the date

hereof has not been, an "Affiliate" of either the Parent or the Company, as that term is defined in Rule 144 of the 1933 Act listed immediately below. Subsequent to the Transfer Closing Date, Seller will take no action which would adversely affect the tacking for the benefit of the Purchaser of Seller's holding period under Rule 144.

An *Affiliate* of an issuer is a *person* that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer.

The term *person* when used with reference to a person for whose account securities are to be sold in reliance upon this section includes, in addition to such person, all of the following persons:

(i)     Any relative or spouse of such person, or any relative of such spouse, any one of whom has the same home as such person;

(ii) Any trust or estate in which such person or any of the persons specified in paragraph (i) of this section collectively own 10 percent or more of the total beneficial interest or of which any of such persons serve as trustee, executor or in any similar capacity; and

(iii) Any corporation or other organization (other than the issuer) in which such person or any of the persons specified in paragraph (a)(2)(i) of this section are the beneficial owners collectively of 10 percent or more of any class of equity securities or 10 percent or more of the equity interest.

f.      No Other Representations. Seller makes no representations or warranties with respect to the Company, its financial status, earnings, assets, liabilities, corporate status or any other matter. The Seller acknowledges that Purchaser is relying on Seller's representations as a material condition to entering into this Agreement.

4.      **CONDITIONS TO SELLER'S OBLIGATION TO SELL.** The obligation of Seller hereunder to sell the Purchased Note to the Purchaser on the terms contemplated hereby at the Closing is subject to the satisfaction, at or before the Transfer Closing Date of each of the following conditions thereto, provided that these conditions are for Seller's sole benefit and may be waived by Seller at any time in its sole discretion:

a.      Purchaser shall have executed this Agreement and any amendment thereto and delivered the same to Seller.

b.      The representations and warranties of such Purchaser shall be true and correct in all material respects as of the date when made and as of the Transfer Closing Date as though made at that time (except for representations and warranties that speak as of a specific date), and Purchaser shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by Purchaser at or prior to the Transfer Closing Date.

7

c.      No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

**5. CONDITIONS TO PURCHASER'S OBLIGATION TO PURCHASE.** The obligation of Purchaser hereunder to purchase the Purchased Note on the terms contemplated hereby at the Closing is subject to the satisfaction, at or before the Transfer Closing Date of each of the following conditions, provided that these conditions are for Purchaser's sole benefit and may be waived by such Purchaser at any time in its sole discretion.

a.      Seller shall have executed this Agreement and any amendment thereto which shall have been acknowledged and consented by the Company, and delivered the same to Purchaser.

b.      Seller shall have delivered to Purchaser the Purchased Note duly endorsed for transfer to Purchaser in accordance with Section 1(c) above.

c.      Purchaser shall have received a copy of the Parent's letter to its transfer agent reserving shares of common stock for Purchaser as outlined in Section 1(d)(v).

d.      The representations and warranties of Seller and the Company shall be true and correct in all material respects as of the date when made and as of the Transfer Closing Date as though made at such time (except for representations and warranties that speak as of a specific date) and Seller and the Company shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by Seller at or prior to the Transfer Closing Date.

e.      No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

6.    **GOVERNING LAW; MISCELLANEOUS.**

a.    Governing Law; Jurisdiction. THIS AGREEMENT SHALL BE ENFORCED, GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CONNECTICUT APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITH SUCH STATE, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS. THE PARTIES HERETO HEREBY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES FEDERAL OR STATE COURTS LOCATED IN FAIRFIELD COUNTY, CONNECTICUT WITH RESPECT TO ANY DISPUTE ARISING UNDER THIS AGREEMENT, THE AGREEMENTS ENTERED INTO IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. BOTH PARTIES IRREVOCABLY WAIVE THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH SUIT OR PROCEEDING. BOTH PARTIES FURTHER AGREE THAT SERVICE OF PROCESS UPON A PARTY MAILED BY FIRST CLASS MAIL SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON THE PARTY IN ANY SUCH SUIT OR PROCEEDING. NOTHING HEREIN SHALL AFFECT ANY PARTY'S RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW. THE PARTIES AGREE THAT A FINAL NON-APPEALABLE JUDGMENT IN ANY SUCH SUIT OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON SUCH JUDGMENT OR IN ANY OTHER LAWFUL MANNER. THE PARTIES HEREBY WAIVE A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER IN RESPECT OF ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.

b.    Counterparts; Signatures by Facsimile. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party. This Agreement, once executed by a party, may be delivered to the other party hereto by facsimile transmission of a copy of this Agreement bearing the signature of the party so delivering this Agreement.

c.    Headings. The headings of this Agreement are for convenience of reference only and shall not form part of, or affect the interpretation of, this Agreement.

d.    Severability. In the event that any provision of this Agreement is invalid or enforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any provision hereof which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

9

e.     Entire Agreement; Amendments. This Agreement and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither Seller nor Purchaser makes any representation, warranty, covenant or undertaking with respect to such matters. No provision of this Agreement may be waived or amended other than by an instrument in writing signed by the party to be charged with enforcement.

f.     Notices. Any notices required or permitted to be given under the terms of this Agreement shall be sent by certified or registered mail (return receipt requested) or delivered personally or by courier (including a recognized overnight delivery service) or by facsimile and shall be effective five days after being placed in the mail, if mailed by regular United States mail, or upon receipt, if delivered personally or by courier (including a recognized overnight delivery service) or by facsimile, in each case addressed to a party. The addresses for such communications shall be as provided in Schedule A annexed hereto. Seller may change its address by notice similarly given to each Purchaser. Each Purchaser may change its address by notice similarly given to Seller.

g.     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns. Neither Seller nor Purchaser shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other. Notwithstanding the foregoing, subject to Section 2(f), Purchaser may assign its rights hereunder to any person that purchases the same in a private transaction from Purchaser or to any of its "Affiliates," without the consent of Seller.

h.     Third Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

i.     Further Assurances. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

j.     No Strict Construction. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

10

_Signature_ | **SIGNATURE BANK**

# Wire Confirmation

**The wire transfer request below has been transmitted successfully.**

Transmitted:    04/06/2018 04:03:35 PM (ET)
Transmitted By: NARINE

| Account | Template Name | Recipient Name | Amount | Currency | Effective Date | Confirmation Number | Approval Status |
|---------|---------------|----------------|--------|----------|----------------|---------------------|-----------------|
| Trillium Partners LP - *3577 | Yenwen Tochimoto Trillium | Yenwen Tochimoto | $50,000.00 | USD | 04/06/2018 | 3183122291 | 1 of 1 received |

NOTICE OF CONVERSION

(To be Executed by the Registered Holder in Order to Convert the Promissory Note)

TO:    ADVANZEON SOLUTIONS INC. (fka: Comprehensive Care Corp.) VIA EMAIL:

‹The undersigned hereby irrevocably elects to exercise the right, represented by the PROMISSORY NOTE first issued as of August 14, 2015 by ADVANZEON SOLUTIONS INC. (fka: Comprehensive Care Corp.), (the "Note") to convert the principal plus accrued interest and associated fees equal to $51,230.96 into 1,597,971 shares ("Conversion Shares") of the Common Stock, no par value ("Common Stock"):

The undersigned represents that the amount of shares to be issued pursuant to this conversion notice when aggregated with all other shares of common stock currently beneficially owned by undersigned does not result in undersigned owning more than 9.99% of the outstanding common stock as of the date of this conversion notice, as determined in accordance with Section 16 of the Exchange Act and the regulations promulgated thereunder.

Upon completion of this conversion notice, the balance of the Securities Transfer Agreement dated April 6, 2018 held by undersigned is $0.00.

Dated: May 1, 2018

Holder's Signature:

TRILLIUM PARTNERS LP

By: _____
         Henry Sargent

Holder's Address:
        90 Grove Street
        Ridgefield, CT 06877

**Delivery Instructions:**

If DWAC or DRS: DTC# 8072
If Physical:
Alpine Securities
39 Exchange Place
Salt Lake City, UT 84111
F/B/O SCOTTSDALE CAPITAL ADVISORS
**F/A/O TRILLIUM PARTNERS LP**
**A/C# 781967690**

## CONVERSION CALCULATION (IN LITIGATION)

| Note ID# | Name of Issuer | Symbol | Short Name of Note | Ext Date | Outstanding shs as of 4/30/18 | Fees |
|---|---|---|---|---|---|---|
| CHCR-CD-1803-0 | Advanzeon Solutions, Inc. | CHCR | Trillium-Shirogane Funding | 5/1/2018 | 65,063,685 | |

Terms: 50% of the lowest bid price in the 20 days prior to day of conversion

**Interest Calculation**

|  |  |  | Pricing Period: | 4/3/18 | 4/30/18 |
|---|---|---|---|---|---|

Days of Interest

| | | | | |
|---|---|---|---|---|
| Start Date | 6-Apr-18 | | Lowest bid closing price: | 4/11/18 | 0.06412 |
| Conversion date | 1-May-18 | | | | |
| Interest Days | 25 | | | low bid price | 0.06412 |
| Calendar Days | 365 | | 50% | Discount: | 0.032060 |
| % of yearly Interest | 0.0685 | | Discounted Price per Share: | $0.032060 | 50% |
| Principal amount | $50,000.00 | | | | |
| Interest rate | 12% | | Dollar Amount converted: | $50,000 | |
| Annual Intrest pmt | $6,000.00 | | Price per share =50% of the lowest bid price: | $0.032060 | |
| Interest due to date | $410.96 | | Associated Fee: | 820.00 | |

Issuance fees
B/D fee    570
Opinion    250
           820

| | | | | |
|---|---|---|---|---|
| Total Amount (Princ. + Int) Converted | $51,230.96 | | Shares already owned: | 0 |
| | | | Shares to be received | 1,597,971 |
| | | | Total new ownership: | 1,597,971 |

| | | | | |
|---|---|---|---|---|
| **Balance Prior to conversion** | $50,000.00 | | 4.99% of Shares Outstanding: | 3,246,678 |
| Balance After this conversion | $0.00 | | Percentage of ownership after | 2.456% |

| CHCR US Equity | | | 90) Export | | 97) Settings | | Page 1/6 | Historical Price Table |
|---|---|---|---|---|---|---|---|---|

Comprehensive Care Corp

| | | | | | | High | .24465 | on | 08/02/17 |
|---|---|---|---|---|---|---|---|---|---|
| Range | 05/01/2017 - 05/01/2018 | | Period | Daily | | Low | .06412 | on | 04/11/18 |
| Market | Bid Price | Volume | Currency | CAD | | Average | .14375 | | 44,663 |
| View | Price Table | | | | | Net Chg | .02382 | | 32.82% |

| | Date | Bid Price | Volume | | Date | Bid Price | Volume | | Date | Bid Price | Volume |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Fr | 05/04/18 | | | Fr | 04/13/18 | .09452 | 35,085 | Fr | 03/23/18 | .10911 | 125,058 |
| Th | 05/03/18 | | | Th | 04/12/18 | .07552 | 1,100 | Th | 03/22/18 | .10322 | 220,073 |
| We | 05/02/18 | | | We | 04/11/18 L | .06412 | 231,400 | We | 03/21/18 | .0908 | 42,620 |
| Tu | 05/01/18 | .09641 | 119,100 | Tu | 04/10/18 | .07568 | 460,638 | Tu | 03/20/18 | .0812 | 45,512 |
| Mo | 04/30/18 | .09657 | 108,700 | Mo | 04/09/18 | .0826 | | Mo | 03/19/18 | .07969 | 28,876 |
| Fr | 04/27/18 | .09653 | 190,782 | Fr | 04/06/18 | .08289 | | Fr | 03/16/18 | .07986 | 42,937 |
| Th | 04/26/18 | .1029 | 183,431 | Th | 04/05/18 | .08304 | 4,000 | Th | 03/15/18 | .12391 | 24,563 |
| We | 04/25/18 | .07721 | 149,861 | We | 04/04/18 | .08316 | 58,508 | We | 03/14/18 | .12283 | 6,944 |
| Tu | 04/24/18 | .0898 | 81,100 | Tu | 04/03/18 | .10873 | 1,000 | Tu | 03/13/18 | .11967 | |
| Mo | 04/23/18 | .08089 | 120,100 | Mo | 04/02/18 | .10978 | 271,549 | Mo | 03/12/18 | .12194 | |
| Fr | 04/20/18 | .0828 | 83,834 | Fr | 03/30/18 | | | Fr | 03/09/18 | .11882 | 6,252 |
| Th | 04/19/18 | .07966 | 121,150 | Th | 03/29/18 | .11483 | 170,280 | Th | 03/08/18 | .11981 | 19,489 |
| We | 04/18/18 | .10749 | | We | 03/28/18 | .11603 | 215,088 | We | 03/07/18 | .1557 | |
| Tu | 04/17/18 | .10653 | 1,200 | Tu | 03/27/18 | .09134 | 282,063 | Tu | 03/06/18 | .15479 | 6 |
| Mo | 04/16/18 | .09494 | 17,650 | Mo | 03/26/18 | .09057 | 90,800 | Mo | 03/05/18 | .12329 | 512 |

SN 288754 EDT   GMT-4:00 H443-4707-1 01-May-2018 15:59:11

Australia 61 2 9777 8600 Brazil 5511 2395 9000 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2018 Bloomberg Finance L.P.